FILED
2018 Feb-14 PM 12:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **ROBERT J. HAMBRICK,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )   Case No. 5:15-cv-01038-MHH |
| | ) |
| **MARK T. ESPER,** | ) |
| **in his official capacity as** | ) |
| **Secretary of the Army,** | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Hambrick brings this employment discrimination action against Mark T. Esper in his official capacity as Secretary of the Army.[1] Mr. Hambrick asserts claims for race and gender retaliation in violation of Title VII of the Civil Right Act of 1964. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Secretary Esper asks the Court to dismiss count two and part of count three of Mr. Hambrick's third amended complaint because the Court may not

---

[1] Mark T. Esper became the Secretary of the Army on November 15, 2017. *See* https://www.army.mil/leaders/sa/bio/ (last visited February 7, 2018). Therefore, the Court asks the Clerk to please substitute Mr. Esper for Mr. Speer as the defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

review as part of this action the Army's decisions concerning security clearance matters. (Doc. 28). For the reasons explained below, the Court grants the motion.

## I. STANDARDS OF REVIEW

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion to dismiss, a district court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *See Brophy v. Jiangbo Pharms. Inc.*, 781 F.3d 1296, 1301 (11th Cir. 2015). The Court presents Mr. Hambrick's factual allegations accordingly.

## II. FACTUAL ALLEGATIONS

Since June 20, 2002, Mr. Hambrick, an African-American man, has worked for the United States Army at the Redstone Army Garrison in Huntsville, Alabama. (Doc. 27, ¶¶ 1, 4). From October 2012 until February 2014, Mr. Hambrick worked in a GS-11 position as an EEO Specialist. (Doc. 27, ¶¶ 1, 2, 38).

As an EEO Specialist, Mr. Hambrick was responsible for receiving, processing, and investigating claims of employment discrimination at Redstone Arsenal and counseling employees who made allegations of workplace discrimination. (Doc. 27, ¶ 2). Mr. Hambrick reported to Jacqueline Williams and Martha Miller. (Doc. 27, ¶ 1). Mr. Hambrick received "top performance ratings

and was considered a very dependable employee." (Doc. 27, ¶ 5). Supervisors praised Mr. Hambrick for "frequently exceed[ing] standards," and Mr. Hambrick's last performance evaluation before his EEO activity states that Mr. Hambrick's "co-workers have a high regard for his knowledge and will seek him out when they need a second opinion." (Doc. 27, ¶ 5).

In November 2011 and November 2013, Mr. Hambrick filed EEO complaints against his supervisors. (Doc. 27, ¶ 8). Mr. Hambrick has not provided details about the nature of these complaints.

At some point during Mr. Hambrick's employment, the agency placed a GS-12 program analyst in the EEO office. (Doc. 27, ¶ 10). Mr. Hambrick did not qualify for the GS-12 program analyst position because the position was available only through management's intern program. (Doc. 27, ¶ 10). Therefore, Mr. Hambrick believed that he could not advance beyond a GS-11 position. (Doc. 27, ¶ 10). According to Mr. Hambrick, "[h]is GS-11 status was his career ceiling in the EEO office." (Doc. 27, ¶ 10).

In December 2013, after management placed the GS-12 program analyst in the EEO office, Mr. Hambrick sent emails to his supervisors and "complained that he was performing the same duties as a high level Caucasian female intern, Ms. Corlew, who as a GS-12, was receiving substantially more pay than Mr. Hambrick." (Doc. 27, ¶ 11). Mr. Hambrick contends that from 2010 through

December 2013, supervisors assigned him more work and less favorable work assignments than Ms. Corlew. (Doc. 27, ¶ 14). In a December 18, 2013 email to Ms. Williams, Ms. Miller, and Deputy Commander Curtis Clark, Mr. Hambrick stated:

> I show more initiative th[a]n your analyst and yet my pay grade is less . . . not fair or right. Without an explanation of these disparities, I consider this subtle discrimination. Like I've said time and time before, I would like to be treated the same as all of the other folks.

(Doc. 27, ¶ 12). In his email, Mr. Hambrick also stated that the job duties that he and Ms. Corlew performed required the same knowledge, skill, and responsibility, but Ms. Corlew had no previous EEO experience that justified a $14,500 salary difference. (Doc. 27, ¶ 13).

In January 2014, Mr. Hambrick filed an EEO complaint. (Doc. 27, ¶ 22). Mr. Hambrick has not provided details about the nature of the January 2014 EEO complaint.

Mr. Hambrick alleges that after he complained about the agency placing Ms. Corlew in the GS-12 position, his working relationship with Ms. Miller and Ms. Williams became "very strained." (Doc. 27, ¶ 15). Ms. Miller and Ms. Williams "constantly . . . harassed" Mr. Hambrick for "extremely minor issues." (Doc. 27, ¶ 16). According to Mr. Hambrick, the "constant degrading" and "verbal abuse" continued on a daily basis, and Mr. Hambrick believed that Ms. Miller and Ms. Williams were belittling him to try to force him to resign. (Doc. 27, ¶ 17). In

4

addition, Ms. Miller asked Redstone police to provide "close patrol" near the EEO office and to walk through the building occasionally. (Doc. 27, ¶ 29).

On February 4, 2014, Ms. Williams called Mr. Hambrick into the conference room in the EEO office and gave him a letter of counseling. (Doc. 27, ¶ 7). According to Mr. Hambrick, the letter:

> criticized [him] for a series of email inquiries he had made in December 2013 regarding the handling of a new GS-12 position in the EEO office, which would have constituted a promotion for him, and his feeling that he was being treated in a discriminatory fashion due to his race and sex as it relates to job duties and pay.

(Doc. 27, ¶ 9). The counseling letter revoked Mr. Hambrick's access to the internet and a job-related database, both of which Mr. Hambrick needed to do his job. (Doc. 27, ¶19). Before he received the counseling letter on February 4, 2014, Mr. Hambrick had not been disciplined. (Doc. 27, ¶ 6). Mr. Hambrick believes that Ms. Williams issued the February 4, 2014 counseling letter in retaliation for his complaints of race, sex, and pay discrimination because Ms. Williams and Ms. Miller knew about Mr. Hambrick's prior EEO activity. (Doc. 27, ¶ 20).

Mr. Hambrick acknowledged the counseling, signed the letter, and went to his office. (Doc. 27, ¶ 20). Ms. Williams asked Mr. Hambrick to return to her office. Mr. Hambrick refused, and Ms. Miller ordered Mr. Hambrick to leave the office and take the rest of the day off. (Doc. 27, ¶ 23). Mr. Hambrick had parked

his car in a lot off base that morning, so Mr. Hambrick called security to request an escort to his car. (Doc. 27, ¶ 24).

When Ms. Miller and Ms. Williams learned that Mr. Hambrick called security, Ms. Miller called Redstone Arsenal's Emergency Services Director and Chief of Police and reported that Mr. Hambrick had "created a disturbance in the office." (Doc. 27, ¶ 26). Mr. Hambrick contends that Ms. Miller knew that her report to police about him was "false, exaggerated, and misleading." (Doc. 27, ¶ 27). Mr. Hambrick also maintains that Ms. Miller told EEO staff that he had been disorderly when Ms. Miller knew that this information was not true. (Doc. 27, ¶ 27).

When police arrived at the EEO office, Mr. Hambrick was waiting quietly outside for a ride to his car. (Doc. 27, ¶ 31). At Ms. Miller's direction, police questioned, searched, handcuffed, and arrested Mr. Hambrick. (Doc. 27, ¶ 32). Police later released Mr. Hambrick and instructed him not to return to the EEO office. (Doc. 27, ¶ 32). One of Mr. Hambrick's co-workers in the EEO office witnessed Mr. Hambrick's arrest and stated that "considering the tense race relations in this office[,] I can't rule out that intolerance wasn't a factor preceding the arrest." (Doc. 27, ¶ 34).

On February 19, 2014, Ms. Miller advised Mr. Hambrick that he could return to full duty on February 24, 2014, but Mr. Hambrick could not work in the

6

EEO office. (Doc. 27, ¶ 38). Ms. Miller told Mr. Hambrick to report to a non-supervisory safety specialist who was located in a different building. (Doc. 27, ¶ 38). Mr. Hambrick alleges that in violation of the rules governing civilian personnel, Ms. Miller transferred him to a position outside of his job classification, under the supervision of a non-supervisory employee, to an office having no connection with his EEO duties. (Doc. 27, ¶ 39). Since his return to work at the end of February 2014, Mr. Hambrick has not been allowed to return to the EEO office or the building where the office is located, and Mr. Hambrick has not received meaningful work. (Doc. 27, ¶ 40). According to Mr. Hambrick, he "merely report[s] to work and occup[ies] a desk." (Doc. 27, ¶ 40).

On March 19, 2014, the agency delivered a memo to Mr. Hambrick. (Doc. 27, ¶ 42). The memo was dated March 10, 2014. (Doc. 27, ¶ 42). In the memo, Ruby Childers, Redstone Arsenal's Security Manager, advised that Redstone had suspended Mr. Hambrick's access to classified information and IT systems because of Mr. Hambrick's "disorderly conduct" and his "argumentative, aggressive, and non-compliant behavior." (Doc. 27, ¶ 42). Ms. Childers's memo informed Mr. Hambrick that "pending further adjudication of your case, you will be reassigned to non-sensitive duties." (Doc. 27, ¶ 43).

On March 28, 2014, Ms. Miller gave Mr. Hambrick notice of a proposed 10-day suspension for "creating a disturbance in the workplace and discourtesy"

related to the events on February 4, 2014. (Doc. 27, ¶ 55). On June 17, 2014, Deputy Commander Clark converted the proposed suspension to a final decision and suspended Mr. Hambrick for 10 days without pay. (Doc. 27, ¶ 57). The suspension was effective June 23, 2014. (Doc. 27, ¶ 57). Mr. Hambrick had named Deputy Commander Clark as a "discriminating official" in at least two of his (Mr. Hambrick's) EEO complaints. (Doc. 27, ¶ 58).[2]

After Deputy Commander Clark officially suspended Mr. Hambrick without pay, Mr. Hambrick learned that Deputy Commander Clark previously had denied without explanation a "time off" award for which Mr. Hambrick had been recommended based on Mr. Hambrick's service between December 14, 2012 and October 5, 2013. (Doc. 27, ¶¶ 59-60). Based on Deputy Commander Clark's decision to deny the "time off" award, Mr. Hambrick has one less merit award than other similarly-situated GS-11 personnel which, according to Mr. Hambrick, makes him less competitive for promotional opportunities. (Doc. 27, ¶ 62). Mr. Hambrick alleges that all other non-supervisory female employees in Redstone's EEO office, including Ms. Corlew, received their "time off" awards, and none of these female employees filed EEO complaints. (Doc. 27, ¶¶ 63, 64).

On July 24, 2014, Ms. Childers submitted an incident report to the Department of Defense's Central Adjudication Facility or CAF and formally

---

[2] The third amended complaint does not specify which complaints named Deputy Commander Clark or when Mr. Hambrick filed the complaints.

sought suspension of Mr. Hambrick's security clearance. (Doc. 27, ¶¶ 47-49). CAF is the entity that determines whether to suspend or revoke an Army employee's security clearance. (Doc. 27, ¶ 48). In the incident report, Ms. Childers stated that Mr. Hambrick posed a security threat and had "psychological conditions" which made Mr. Hambrick "unfit for duty." (Doc. 27, ¶ 53). Mr. Hambrick alleges that the incident report contained false and misleading information. (Doc. 27, ¶ 49). According to Mr. Hambrick, the agency submitted the incident report and sought to revoke his security clearance in retaliation for his EEO complaints. (Doc. 27, ¶ 50). Mr. Hambrick contends that since Ms. Childers submitted the incident report, CAF has not acted upon Ms. Childers's report or suspended his security clearance. (Doc. 27, ¶¶ 52, 78). Mr. Hambrick continues to perform "meaningless tasks" at a desk away from his EEO work station. (Doc. 27, ¶ 52; *see also* Doc. 27, ¶ 75).

Because Mr. Hambrick has not performed work in the EEO office since February 2014, Mr. Hambrick contends that he has missed three annual performance evaluation cycles, and his job application and resume will have a gap in service. (Doc. 27, ¶ 77). On at least three occasions during 2014, Mr. Hambrick's supervisors denied requests for leave without pay, sick leave, and annual leave. (Doc. 27, ¶ 78).

In February 2015, Deputy Commander Clark called Mr. Hambrick to his office to discuss Mr. Hambrick's pending EEO claims and to attempt to force Mr. Hambrick to settle the claims. (Doc. 27, ¶ 65). The proposed settlement involved reinstatement of Mr. Hambrick's security clearance and his transfer to another Army facility out of state. (Doc. 27, ¶¶ 66, 67(e)). Specifically, Redstone Arsenal offered to "reverse the *local* suspension of [Mr. Hambrick's] access to classified information and Information Technology (IT) Systems." (Doc. 27, ¶ 67(e); *see also* Doc. 30-3, p. 2, ¶ 3(e)) (emphasis added). Mr. Hambrick asserts that the Army's attempt to transfer him "to Fort Leonard Wood is a clear indication of the lack of validity of the security clearance issues raised by the Defendant against Mr. Hambrick." (Doc. 27, ¶ 73).

Mr. Hambrick contends that on the Army's side, "[a]ll management figures were involved with the settlement discussions, including agency counsel," but his attorney was not included in the settlement discussions until agency counsel contacted his attorney to ask for "permission to communicate with Mr. Hambrick to obtain his signature on the settlement documents." (Doc. 27, ¶¶ 65, 69, 71). Mr. Hambrick asserts that "Mr. Curtis' attempt to force a resolution of Mr. Hambrick's EEO complaints without the knowledge of his counsel was another act of retaliation and a retaliatory hostile work environment." (Doc. 27, ¶ 72).

According to Mr. Hambrick, Ms. Miller, Ms. Williams, and Deputy Commander Clark have resigned from their positions with the Army. (Doc. 27, ¶ 79).

Based on these allegations, Mr. Hambrick asserts four counts of Title VII race and gender retaliation claims against Secretary Esper. In his third amended complaint, Mr. Hambrick alleges that Secretary Esper, through his managerial employees, retaliated against Mr. Hambrick by:

- Submitting a false police report about Mr. Hambrick's conduct on February 4, 2014, (Count I, Doc. 27, ¶ 82);

- Submitting false information to CAF as a basis to revoke Mr. Hambrick's security clearance, (Count II, Doc. 27, ¶ 83);

- Transferring Mr. Hambrick from the EEO specialist position to a desk with no duties for over three months before officially seeking to revoke his security clearance; issuing a 10-day suspension without pay; and denying the "time off" award that Mr. Hambrick earned, (Count III, Doc. 27, ¶ 84);

- Attempting to force Mr. Hambrick to settle his EEO claims by requiring him to move out of state without notifying Mr. Hambrick's attorney, (Count IV, ¶ 85).

## III. ANALYSIS

The Secretary argues that the Court must dismiss count two and part of count three of Mr. Hambrick's third amended complaint to the extent that these retaliation claims concern security clearance investigations and determinations because, according to the Secretary, "[i]t is well-established that government agency security investigations and determinations are not reviewable as alleged retaliation or other discrimination under Title VII and other discrimination statutes." (Doc. 23, p. 4) (citing *Dep't of Navy v. Egan*, 484 U.S. 518 (1988), and *Hill v. White*, 321 F.3d 1334 (11th Cir. 2003)).

In *Egan*, the Supreme Court held that the Merit Systems Protection Board did not have authority "to review the substance" of the Navy's "underlying decision to deny or revoke a security clearance in the course of reviewing" the plaintiff's wrongful termination claim. *Egan*, 484 U.S. at 520. The Supreme Court explained that "the grant of security clearance to a particular employee, a sensitive and discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Egan*, 484 U.S. at 527. The Supreme Court continued:

> The grant of a clearance requires an affirmative act of discretion on the part of the granting official. The general standard is that a clearance may be granted only when "clearly consistent with the interests of the national security." *See, e.g.,* Exec. Order No. 10450, §§ 2 and 7, 3 CFR 936, 938 (1949–1953 Comp.); 10 CFR § 710.10(a)

12

> (1987) (Department of Energy); 32 CFR § 156.3(a) (1987) (Department of Defense).  A clearance does not equate with passing judgment upon an individual's character.  Instead, it is only an attempt to predict his possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information.  It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct, such as having close relatives residing in a country hostile to the United States.  "[T]o be denied [clearance] on unspecified grounds in no way implies disloyalty or any other repugnant characteristic." *Molerio v. FBI*, 242 U.S. App. D.C. 137, 146, 749 F.2d 815, 824 (1984).  The attempt to define not only the individual's future actions, but those of outside and unknown influences renders the "grant or denial of security clearances ... an inexact science at best." *Adams v. Laird*, 136 U.S. App. D.C. 388, 397, 420 F.2d 230, 239 (1969), cert. denied, 397 U.S. 1039, 90 S. Ct. 1360, 25 L.Ed.2d 650 (1970).

*Egan*, 484 U.S. at 528-29.

Because "[p]redictive judgment of this kind must be made by those with the necessary expertise in protecting classified information," the Supreme Court concluded that:

> the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it.  Certainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence.  Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.

*Egan*, 484 U.S. at 529.

Applying *Egan*, in *Hill*, the Eleventh Circuit held that the district court properly dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a civilian Army employee's age discrimination claim based on a suspension of the employee's security clearance. *Hill*, 321 F.3d at 1335-36. In *Hill*, the plaintiff alleged "that his supervisor initiated disciplinary proceedings against him for charges that he sa[id] were false and frivolous and motivated by a desire to discriminate against him because of his age." *Hill*, 321 F.3d at 1335. Consistent with a final administrative decision, the plaintiff was suspended for three days, and he had to undergo a mental evaluation. *Hill*, 321 F.3d at 1335. Afterwards, the Army suspended the plaintiff's security clearance. *Hill*, 321 F.3d at 1335.

The plaintiff in *Hill* did "not challenge the decision to suspend his security clearance." *Hill*, 321 F.3d at 1335. Instead, the plaintiff challenged "the initiation of the security clearance investigation, claiming it was improperly motivated by discrimination." *Hill*, 321 F.3d at 1335. In finding that the district court properly held that the plaintiff's claim was not within the jurisdiction of the court, the Eleventh Circuit held:

> The United States Supreme Court has made clear that a decision concerning the issuance or non-issuance of security clearance is a matter within the purview of the executive and not to be second-guessed by the judiciary unless Congress has specifically provided otherwise. *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized.

*Hill*, 321 F.3d at 1336.

Mr. Hambrick acknowledges that in *Egan*, the Supreme Court "held that lower courts could not review the substance of Executive Branch security clearance decisions, in the context of assessing other viable legal claims, including those under Title VII, in deference to national security," and that in *Hill*, the Eleventh Circuit "cited *Egan* in dismissing discrimination claims that challenge employment actions involving the security clearance process." (Doc. 30, pp. 1-2). Citing *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012), a decision from the United States Court of Appeals for the District of Columbia, Mr. Hambrick argues that his claim should survive because, like the plaintiff in *Rattigan*, the "security" concerns at issue that prompted the initial security clearance action against him belong only to "lower level employees," and the "predictive judgments that fall within the scope of *Egan* and the national security exemption are the province of the Department of Defense's Consolidated Adjudications Facility (DoD CAF) and employees specifically trained in such matters." (Doc. 30, p. 2; *see generally* Doc. 27 (alleging that security clearance action was local and that CAF has not acted on the incident report that Redstone Arsenal submitted to CAF)).[3]

In *Rattigan*, an FBI employee alleged that the agency retaliated against him in violation of Title VII "by reporting unfounded security concerns" to the security division which led to an investigation into the plaintiff's "continued eligibility for a

---

[3] *Rattigan* is an appeal from a jury verdict in favor of the plaintiff on a retaliation claim. 689 F.3d at 766.

security clearance." *Rattigan*, 689 F.3d at 765. On petition for rehearing, the District of Columbia Circuit maintained its holding that "*Egan's* absolute bar on judicial review covers only security-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns" because "the decision by a non-expert employee to refer a colleague for a potential security investigation is categorically unlike the predictive judgment made by appropriately trained adjudicative personnel who make security clearance decisions pursuant to delegated Executive authority and subject to established adjudicative guidelines." *Rattigan*, 689 F.3d at 767-78 (internal quotation marks and alteration omitted).

To prevent the chilling of reports of security concerns by non-expert employees, the *Rattigan* court held that a plaintiff's Title VII retaliation claim relating to the initiation of a security clearance investigation could proceed only if the plaintiff could "show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Rattigan*, 689 F.3d at 771. The District of Columbia Circuit found that an employee's Title VII claims of knowingly false security reports or referrals is consistent with *Egan* because "[h]owever critical it is for employees to report doubtful or unreliable information, the Security Division cannot possibly be assisted by employees who knowingly report false information—that is, outright

16

lies—about fellow employees." *Rattigan*, 689 F.3d at 770. The *Rattigan* court reasoned that a federal agency has no "greater competence than juries when it comes to determining what a particular person knew at a particular time and whether that person intentionally reported false information about a co-worker." *Rattigan*, 689 F.3d at 771. The District of Columbia Circuit concluded that "[w]ere we to declare all reporting-based claims nonjusticiable, federal employees could no longer seek redress for the harm caused when a coworker fabricates security concerns in retaliation for statutorily protected activity, and Congress's purpose in enacting Title VII would be frustrated." *Rattigan*, 689 F.3d at 771.

Mr. Hambrick's factual allegations are on all-fours with the *Rattigan* decision, but *Rattigan* is not binding on this Court, and *Hill*, binding Eleventh Circuit precedent, provides that this Court may not exercise jurisdiction over Mr. Hambrick's claims based on Ms. Childers's initiation of a security clearance revocation. Like the plaintiff in *Hill*, Mr. Hambrick claims that the charges against him are "false and frivolous and motivated by a desire to discriminate against him." (*Compare* Doc. 1, ¶ 49 *with Hill*, 321 F.3d at 1335). As in *Hill*, to the extent that Mr. Hambrick's retaliation theories rest upon allegations concerning

"the initial stages of a security clearance determination," the Court is without jurisdiction to adjudicate Mr. Hambrick's claims.[4]

## IV. CONCLUSION

For the reasons explained above, the Court grants Secretary Esper's partial motion to dismiss. The Court dismisses for lack of subject matter jurisdiction count two of Mr. Hambrick's third amended complaint and the portion of count three of Mr. Hambrick's third amended complaint that concerns his security clearance.

**Within 10 days of entry of this order**, the parties shall please confer and file an amended Rule 26(f) report. Thus, the Court denies as moot Mr. Hambrick's motion for an order setting deadlines for the submission of a Rule 26 report. (Doc. 35).

**DONE** and **ORDERED** this February 14, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[4] *See also Paschal v. McHugh*, 2015 WL 3836965, *21-23 (N.D. Ala. June 22, 2015), *aff'd*, *Paschal v. Sec'y of the Army*, 648 Fed. Appx. 898 (11th Cir. 2016).

The Secretary filed his motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 28, p. 1). Because the Eleventh Circuit decided *Hill* on the basis of Rule 12(b)(6), the dismissal in this case rests on Rule 12(b)(6) rather than Rule 12(b)(1).